UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CAMERON DAVON WRIGHT,

                    Petitioner,                    Case No. 1:22-cv-392

v.                                                 Honorable Paul L. Maloney

JAMES SCHIEBNER,

                    Respondent.
_____/

## OPINION

     This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254.

Petitioner Cameron Davon Wright is incarcerated with the Michigan Department of Corrections

at the Muskegon Correctional Facility (MCF) in Muskegon, Muskegon County, Michigan. On

January 29, 2019, following a nine-day jury trial in the Kent County Circuit Court (Case No. 18-

06740-FC), Petitioner was convicted of the 2018 first-degree murder of Curtis Swift, in violation

of Mich. Comp. Laws § 750.316, being a felon in possession of a firearm, in violation of Mich.

Comp. Laws § 750.224f, and using a firearm during the commission of a felony (felony-firearm)

second offense, in violation of Mich. Comp. Laws § 750.227b. On February 28, 2019, the court

sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to prison terms of

life without parole for murder and 50 to 100 years for being a felon in possession of a firearm.

Those sentences were to be served concurrently with each other, but consecutively to a sentence

of 5 years for felony-firearm. The 5-year sentence, in turn, was to be served consecutively to

sentences for offenses for which Petitioner was on parole when he murdered Curtis Swift.

On May 2, 2022, Petitioner filed his habeas corpus petition raising one ground for relief, as follows:

I.      [Fifth] Amendment self-incrimination clause violation had a substantial and injurious effect or influence in determining the jury's verdict.

(Pet., ECF No. 1, PageID.5.) Respondent asserts that Petitioner's ground for relief is meritless. (ECF No. 7.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus. The Court will also deny Petitioner's motion for writ of mandamus and prohibition and other extraordinary writs (ECF No. 15).

<u>Discussion</u>

**I.      Factual Allegations**

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

> In 2013, Andre Davis was shot and killed during a drive-by shooting. [Petitioner] was questioned during the initial investigation, but the police reached a dead end. In 2017, the Grand Rapids Police Department launched a new investigation and began to narrow in on [Petitioner] as the primary suspect. In January 2018, detectives issued investigative subpoenas to several witnesses. [Petitioner] was well aware of these facts.
>
> [Petitioner] knew that Javon Turley had testified pursuant to an investigative subpoena. When [Petitioner] was interviewed about Davis's murder in 2013, he stated that he was at the apartment of his girlfriend, Kiara Adams, at the time of Davis's murder and that Turley had driven him there. In January 2018, [Petitioner] asked Adams to tell the police that Turley had dropped him off at her apartment in the early morning hours of August 25, 2013. [Petitioner] also knew that Eduardo Welford and Tyrice Morris had testified pursuant to investigative subpoenas. At trial, Welford and Morris testified that they were in a vehicle with [Petitioner] and Curtis Swift when [Petitioner] shot a gun into the vehicle carrying Davis. On January 16, 2018, [Petitioner] used an intermediary to contact Welford while he was on a work release jail program. Morris originally told police he knew nothing about Davis's shooting. However, after Swift was found dead, Morris returned to the police station and identified [Petitioner] as Davis's shooter.

Officers did not locate Swift in time to issue an investigative subpoena. On January 19, 2018, Swift was found dead in his house. Swift's two cell phones were missing, but nothing else was stolen. In fact, Swift had a substantial amount of cash in his pocket.

On January 17, Swift told Jaimaelah Stokes, the mother of one of his children, that he needed to talk to "Cam"—[Petitioner]—and get him to admit that he shot Davis. Swift told Stokes that he was in the car when the shooting happened and that another person in the car had already "snitch[ed]." Stokes last saw Swift at around 8:30 p.m. on January 17. She tried to text him after, but Swift did not respond.

Bao Nguyen testified that he telephoned Swift at around 8:40 p.m. on January 17, and then went to Swift's home. Swift was home alone and sold Nguyen drugs. Swift appeared "a little nervous" and was "acting funny." Swift told Nguyen that his "cuz" was coming over. When Nguyen left, he loitered outside his vehicle for a short time. He saw [Petitioner] walk up the street toward Swift's house. No one else was in the area. Nguyen texted Swift a couple of hours later and called him eight times the following day. Swift did not respond to the text or answer the calls. Nguyen solicited a mutual friend to call Swift. Swift did not answer that call either.

Swift did not attend his daughter's birthday party on January 18, and did not answer calls from Stokes or his daughter's mother, Elisha Holloway. At the time of his death, Swift was dating Carlasia Wells. In the days leading up to his death, Wells overheard Swift on a call telling someone that he did not "have anything to do with that" and to quit calling his phone. Swift told Wells that the call came from "Cam and them." Wells described that Swift seemed paranoid during that period. The last time she heard from Swift was 6:18 p.m. on January 17. She went to Swift's home at 9:30 p.m. on January 18, but Swift did not answer the door.

Glen Johnson testified that he contacted [Petitioner] on the evening of January 17 to purchase drugs from him. Johnson described [Petitioner] as a dependable dealer who always came when called. On the evening of January 17, however, [Petitioner] kept pushing back his meeting time with Johnson. After promising to arrive by 9:40 p.m., [Petitioner] did not come until 11:19.

We note that [Petitioner] was convicted of murdering Davis in a separate action. We affirm that conviction in Docket No. 348250, which is being considered contemporaneously with this appeal. The jury in the current matter also convicted [Petitioner] of Swift's murder and connected firearm offenses.

*People v. Wright*, No. 348251, 2021 WL 2769814, at *1–2 (Mich. Ct. App. July 1, 2021).[1]

---

[1] Petitioner was sentenced to concurrent sentences of life without parole for first-degree murder and 6 to 10 years for possession of a firearm by a felon and carrying a concealed weapon, along with a consecutive 2-year sentence for felony-firearm, for the Davis murder. *See Wright v. Schiebner*, No. 1:23-cv-472, 2023 WL 3714602, at *1 (W.D. Mich. May 30, 2023). Petitioner is

Prior to trial, Petitioner, through counsel, filed a motion to suppress evidence obtained from a search of Petitioner's cell phone. *Id.* at *3. As noted above, Petitioner was on parole at the time of the Swift murder. As a condition of parole, Petitioner agreed to the following condition: "I voluntarily consent to a search of my person and property upon demand by a peace officer or parole officer. If I do not sign this written consent, I understand that my parole may be rescinded or revoked." *Id.* Petitioner also agreed to "comply with special conditions imposed by the Parole and Commutation Board and with written or verbal orders made by the field agent." *Id.*

---

also serving sentences following convictions in *People v. Wright*, Case No. 14-09000-FH (Kent Cnty. Cir. Ct) (a "fleeing" case), and *People v. Wright*, Case No. 13-07991-FH (Kent Cnty. Cir. Ct.) (a drug case). *See id.* The Court has summarized Petitioner's various sentences as follows:

> As a result of the various convictions, Petitioner is currently serving two concurrent consecutive sentence strings. The string related to the Davis murder commenced on February 28, 2019 (with credit for 460 days of time served). The string started with a 2-year sentence for a felony-firearm violation. When that sentence is complete— and it is now complete—Petitioner is required to serve concurrent sentences of life imprisonment without parole, for first-degree murder, and 6 to 10 years' imprisonment, for possession of a firearm by a felon and carrying a concealed weapon.

> The other consecutive string begins with concurrent sentences from the drug case and the "fleeing" case. When those sentences are complete, Petitioner will begin serving the sentences for the Swift murder. The Swift sentences will commence with a 5-year sentence for felony-firearm. Upon completion of that sentence, Petitioner will serve concurrent sentences of life imprisonment without parole for first-degree murder and 50 to 100 years' imprisonment for possession of a firearm by a felon.

*Id.* In May of 2023, Petitioner filed a federal habeas petition challenging his convictions arising from the Davis murder. The Court granted in part and denied in part his motion to stay those proceedings and hold them in abeyance, directed Petitioner to either file a motion to amend his petition or a motion to lift the stay once he exhausted his claims for relief in state court, and directed that the matter be administratively closed pending Petitioner's motion to amend or motion to lift the stay. *See id.* at *3–4.

In his motion to suppress, Petitioner averred that a cell phone was found in the house in which Petitioner was arrested. *Id.* Once Petitioner was in custody, the interrogating officer presented the phone and asked for the passcode so that the phone's contents could be searched. *Id.* Petitioner refused, and the officer told Petitioner that "he had to since he was on parole" and that "as a parolee he was required to give them the information." *Id.* Petitioner subsequently gave the officer the passcode, the phone was opened, and the contents therein were searched. *Id.*

The trial court denied Petitioner's motion for an evidentiary hearing and to suppress "for the reasons it denied the same motion in the [Davis] murder trial underlying Docket No. 348250." *Id.* The trial court gave the following reason for the denial: "[T]he defendant was on parole, had signed releases and agreed to be searched. And not only him, but his possessions. I find no reason to exclude this information from trial." *Id.*

Jury selection for Petitioner's trial began on January 14, 2019. (Trial Tr. I, ECF No. 8-7.)[2] Over the course of nine days, the jury heard testimony from numerous witnesses. The jury reached a guilty verdict on January 29, 2019. (ECF No. 8-1, PageID.213.) Petitioner appeared before the trial court for sentencing on February 28, 2019. (ECF No. 8-15.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals, raising the following issues: (1) the trial court erred by denying the jury's request to rehear the testimony given by witnesses Nguyen, Stokes, and Hairston; (2) the prosecution presented insufficient evidence to support a conclusion that Petitioner was the individual who killed Swift; (3) Petitioner's right against self-incrimination was violated when, after his arrest, the interrogating officer told Petitioner that he could not refuse to provide the

---

[2] The record reflects that a jury was initially selected on January 7, 2018, but that the trial court declared a mistrial the next day premised upon a challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). (ECF No. 8-6.)

5

passcode for his cell phone and that his parole would be revoked if he refused; (4) the admission of testimony regarding Swift's out-of-court statements violated Petitioner's Sixth Amendment Confrontation Clause rights; (5) the trial court erred by admitting at trial testimony given by witness Adams during Petitioner's preliminary examination; (6) the trial court's supplemental instruction regarding reasonable doubt, which was given at the start of jury selection, was erroneous; (7) the trial judge was biased and should have recused himself; and (8) the prosecutor committed misconduct by opining on the content of deleted text messages between Petitioner and Swift during closing arguments. *See Wright*, 2021 WL 2769814, at *2–10. The court of appeals affirmed Petitioner's convictions and sentences on July 1, 2021. *Id.* at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on March 8, 2022. *See People v. Wright*, 970 N.W.2d 331 (Mich. 2022). This § 2254 petition followed.

## II. Pending Motion

Petitioner has filed what he calls a "petition for a writ of mandamus and prohibition and other extraordinary writs." (ECF No. 15.) In that motion, Petitioner asks the Court to either expedite its ruling regarding the instant habeas petition or consolidate the instant petition with *Wright v. Schiebner*, No. 1:23-cv-472 (W.D. Mich.). (*Id.*, PageID.2794.) Petitioner also requests an "evidentiary hearing or oral argument so Petitioner [can] verbally argue a complex and novel issue." (*Id.*)

The Court is ruling upon Petitioner's instant habeas petition in this opinion and, therefore, Petitioner's request for an expedited ruling is moot. Moreover, as noted above, Case No. 1:23-cv-472 has been administratively closed pending Petitioner's return to state court to exhaust claims related to his convictions and sentences for the Davis murder. Finally, having reviewed the record in this case, the Court concludes that oral argument is unnecessary. Accordingly, Petitioner's

"petition for a writ of mandamus and prohibition and other extraordinary writs" (ECF No. 15) will be denied.

### III.     AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in

light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate

courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.   Discussion

Petitioner's sole claim for relief is that his Fifth Amendment self-incrimination rights were violated, and that the violation "had a substantial and injurious effect or influence in determining the jury's verdict." (Pet., ECF No. 1, PageID.5.) According to Petitioner, the text messages that were obtained as a result of this violation "devastated [his] defense to first degree murder." (*Id*., PageID.18.)

The Michigan Court of Appeals agreed with Petitioner that his right to be free from self-incrimination had been violated, but that the admission of the cell phone evidence was harmless

error. *Wright*, 2021 WL 2769814, at *5. In reaching that conclusion, the court of appeals set forth

the following analysis:

> "The Fifth Amendment of the United States Constitution guarantees that the government cannot compel a defendant in a criminal case to testify against himself . . . . In addition, art. 1, § 17 of the Michigan Constitution affords defendants a corresponding state constitutional right to be free from compelled self-incrimination." *People v. Cheatham*, 453 Mich. 1, 9; 551 N.W.2d 355 (1996). This right extends to custodial interviews, not just trial, and is protected by reading a suspect his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436; 86 S. Ct. 1602; 16 L. Ed. 2d 694 (1966). *People v. Elliott*, 494 Mich. 292, 301; 833 N.W.2d 284 (2013). A person does not lose his protection against self-incrimination "by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Minnesota v. Murphy*, 465 U.S. 420, 426; 104 S. Ct. 1136; 79 L. Ed. 2d 409 (1984). "An individual must show three things to fall within the ambit of the Fifth Amendment: (1) compulsion, (2) a testimonial communication or act, and (3) incrimination." *In re Grand Jury Subpoena Duces Tecum*, 670 F.3d 1335, 1341 (11th Cir. 2012).
>
> Parolees and probationers have a duty to appear and to truthfully answer questions posed by their probation or parole officer. "[T]he general obligation to appear and answer questions truthfully [does] not in itself convert . . . otherwise voluntary statements into compelled ones." *Murphy*, 465 U.S. at 427.
>
> > The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him *in a pending or later criminal prosecution.* There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution. [*Id.* at 435–436 (emphasis added).]
>
> The defendant in *Murphy* was questioned about an earlier, uncharged offense while at his monthly meeting with his probation officer. [Petitioner], on the other hand, was brought in for questioning by police officers for the 2013 murder of Davis and threatened with revocation of parole for a completely unrelated offense unless he provided the passcode for his cell phone. In *United States v. Sanchez*, 334 F. Supp.

10

3d 1284 (N.D. Ga. 2018), a lower federal court faced this same scenario. In that case, the defendant was arrested and interrogated by law enforcement officers. He only turned over the passcodes to his cell phones "after he repeatedly refused to do so" and was threatened with arrest for a parole violation. *Id.* at 1294. The district court conceded that the officers could charge the defendant with violating parole for failing to turn over the passcodes given the conditions of his parole. *Id.* at 1295.

But, the court determined, use of evidence gathered from the compelled production of the defendant's cell phone passcodes violated the defendant's Fifth Amendment right against self-incrimination and therefore could not be used against him at trial. *Id.* First, the court cited caselaw supporting "that production of cellphone passwords constitutes incriminatory testimony protected by the Fifth Amendment." *Id.* Second, the court compared the facts to those in *Murphy* and several lower court cases, and found a compelling case of compulsion. The defendant in *Sanchez* "twice refused to provide the iPhone passcodes" and the interrogating officer expressly "warned him that his refusal to do so could result in his arrest for a parole violation." *Id.* at 1297. This was "the classic 'penalty situation.'" *Id.* at 1298.

According to [Petitioner], he was interrogated by a parole agent and members of the Grand Rapids Police Department for more than four hours. During the interrogation, [Petitioner] allegedly repeatedly refused to provide the passcode for his cell phone. He only disclosed the code when his parole agent told him that if he refused, he would be violated.

However, the prosecutor advised the court that [Petitioner] was not just arrested for Davis's murder; he was also arrested for violating the conditions of his parole. Wright had already been "violated" before anyone asked him for the code to his cell phone. After Wright was placed in an interrogation room, the parole agent took the cell phone in and asked Wright for the passcode, reminding "him of the conditions of his parole, including allowing warrantless searches of his person and/or property." [Petitioner] provided the passcode, which the parole agent wrote on a piece of paper. The paper was given to the Grand Rapids Police Department. Detectives then came into the interrogation room, read [Petitioner] his *Miranda* rights and [Petitioner] invoked his right to remain silent.

[Petitioner] was under arrest and in custody when he was ordered to turn over his cell phone passcode. Even if he was under arrest for some other violation of his parole conditions, the prosecutor could add to that list if [Petitioner] failed to provide his passcode. Accordingly, [Petitioner] was compelled to turn over his passcode to avoid penalty. This was compelled self-incrimination.

However, given the other evidence against [Petitioner], the admission of the cell phone evidence was harmless. From [Petitioner's] cell phone information, the prosecutor argued that [Petitioner] deleted incriminating text communications with Swift. [Petitioner's] message to Banks "to come in" was also presented from the phone. Although this evidence was damaging, it was not necessary to sustain [Petitioner's] convictions. Nguyen and cell tower data placed [Petitioner] at Swift's

home around the time of the murder. And there was significant evidence that [Petitioner] was pressuring and intimidating Swift and the other witnesses against him, even without evidence that [Petitioner] deleted messages from his phone to hide their contents. Accordingly, any error ultimately was harmless and [Petitioner] is not entitled to relief.

*Wright*, 2021 WL 2769814, at *4–5.

In his brief supporting his § 2254 petition, Petitioner contends that the court of appeals "failed to properly apply the 'harmless beyond a reasonable doubt' standard [set forth in] *Chapman*[*v. California*, 386 U.S. 18 (1967)]" and, therefore, the court of appeals' harmless error determination is unreasonable. (ECF No. 2, PageID.51.) Petitioner argues that the court of appeals failed to "cite *Chapman* or any of *Chapman*'s progeny," and instead "ignored the devastating nature of the Fifth Amendment violation, and upheld the conviction simply because a jury 'permissibly' could have inferred the disputed intent element from other evidence." (*Id.*, PageID.52.)

When evidence is admitted at trial in violation of the Fifth Amendment, the admission "constitutes a constitutional error that is subject to . . . harmless error analysis." *Cooper v. Chapman*, 970 F.3d 720, 729 (2020) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310–11 (1991)). Recently, the Supreme Court considered the test federal habeas courts must apply when considering a constitutional error that the state courts have already determined did not prejudice the defendant. *See generally Brown v. Davenport*, 596 U.S. 118 (2022). In *Brown*, the Court held that "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht*[*v. Abrahamson*, 507 U.S. 619 (1993)] and the one Congress prescribed in AEDPA." *Id.* Thus, in short, "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents [i.e., *Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 134.

As Petitioner acknowledges (ECF No. 2, PageID. 51–52), *Brecht* requires that he show that the error in question had a "substantial and injurious effect or influence" on the outcome of his trial. *See Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The Court set forth that a "substantial or injurious effect or influence" equals a determination that petitioners are not entitled to habeas relief "based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). Thus, relief is proper only if the reviewing court has "grave doubt" about the effect of the error. *Davis v. Ayala*, 576 U.S. 257, 268 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). There must be more than a "reasonable possibility" that the error was harmful. *Brecht*, 507 U.S. at 637. Essentially, *Brecht* provides that the "State "not be put to th[e] arduous task [of retrial] based on mere speculation that the defendant was prejudiced by trial error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam).

As set forth *supra*, AEDPA requires a showing that the state court's adjudication of a claim was "contrary to" or involved an "unreasonable application of" clearly established federal law, or that it was based on an "unreasonable determination of the facts" presented in the state court proceeding. 28 U.S.C. 2254(d). With respect to Petitioner's claim here, AEDPA requires a determination of whether the court of appeals' harmless error review was reasonable under *Chapman*, which set forth the burden of proof associated with harmless error analysis on direct review—"harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. Thus, under AEDPA/*Chapman*, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Davis*, 576 U.S. at 269 (quotation omitted). Here, however, the Court need not reach the reasonableness of the court of appeals' harmlessness determination because, as discussed below, Petitioner fails to demonstrate that the error had a

13

"substantial and injurious effect or influence" on the jury verdict, as required by *Brecht*. 507 U.S. at 637.

Petitioner suggests that the text messages obtained from the search of his cell phone were the "linchpin" of the State's case against him. (ECF No. 2, PageID.43.) Petitioner also notes that the State emphasized the fact that Petitioner had deleted text messages from his phone before his arrest. (*Id.*) Petitioner argues that the State introduced "no fingerprints, DNA, eyewitness[,] or any other physical evidence placing Petitioner inside of Swift's home with Swift." (*Id.*, PageID.42.) Rather, Petitioner avers, the State presented a "circumstantial" case. (*Id.*, PageID.41.) Essentially, Petitioner contends that the admission of the text messages "led to overwhelming other prejudicial evidence against" him, and that without the text messages, "the State's case would have been [Michigan Rule of Evidence] 404(b) evidence of Petitioner's involvement in the Andre Davis case and Bao Nguyen seeing Petitioner outside of Swift's home, which would not have been sufficient evidence to charge Petitioner." (*Id.*, PageID.47–48.)

As an initial matter, Petitioner's focus on the "circumstantial" case presented by the State does not automatically lead to a conclusion that the erroneous admission of the text messages had a substantial and injurious effect or influence on the jury verdict. When discussing Petitioner's sufficiency of the evidence claim, the Michigan Court of Appeals noted that the prosecution was proceeding on a theory that Petitioner either shot Swift or encouraged Derrick Banks to shoot Swift. *Wright*, 2021 WL 2769814, at *2. Furthermore, the court of appeals noted that "[t]he evidence that [Petitioner] was the person who murdered Swift or assisted the person who murdered Swift was circumstantial. There was no eyewitness to the murder." *Id.* Nevertheless, "circumstantial evidence is entitled to the same weight as direct evidence," and "circumstantial evidence alone is sufficient to sustain a conviction." *United States v. Mack*, 808 F.3d 1074, 1080

14

(6th Cir. 2015). Because Petitioner essentially claims that he would not have been convicted had the text messages not been admitted, the Court will provide a summary of the pertinent evidence, excluding the evidence obtained from Petitioner's text messages, introduced at trial below.

During trial, former Grand Rapids Police Officer Erik Boillat testified that during the course of the investigation into Andre Davis's murder, law enforcement identified Petitioner, Eduardo Welford, Tyrice Morris, and Curtis Swift as the individuals who were in the "shooter vehicle." (Trial Tr. II, ECF No. 8-8, PageID.1004–1005.) Kevin Freeman was also identified as an individual who was possibly in the vehicle. (*Id.*, PageID.1005.) Petitioner, Morris, and Freeman were interviewed shortly after Davis's murder. (*Id.*) A Javon Turley was also interviewed. (*Id.*, PageID.1011.) Boillat testified that while he was still with the police department, officers started the process of issuing investigative subpoenas to Swift and Welford as "persons of interest." (*Id.*, PageID.1012.)

Eric Braswell, who was in the car with Davis on the night Davis was murdered, testified that Petitioner was the individual he had fought with earlier that night. (*Id.*, PageID.1041.) Javon Turley testified that when he and Petitioner were in a vehicle that night, Petitioner mentioned that he was "jumped" at the Latvian Hall. (*Id.*, PageID.1055.) Turley was questioned in 2013 but refused to make a statement. (*Id.*, PageID.1059.) He was subsequently summoned via administrative subpoena in 2018. (*Id.*, PageID.1057.) Turley testified that during that questioning, he admitted that he had overheard Petitioner, on the night of Davis's murder, "talking about guns." (*Id.*, PageID.1060.) Turley dropped Petitioner off on the "street behind food town" and saw Petitioner get in a vehicle with Welford, Morris, and Swift. (*Id.*, PageID.1061.) Turley also testified that Petitioner had asked him about the investigative subpoena and what the police had

said. (*Id.*, PageID.1062–1063.) Turley also testified that "years ago" Petitioner had asked Turley to be his alibi. (*Id.*, PageID.1063.)

Eduardo Welford testified that on the night of Davis's murder, he was with Petitioner at the Latvian Club when a "big commission" occurred. (Trial Tr. III, ECF No. 8-9, PageID.1113.) Petitioner told Welford that he had been fighting. (*Id.*) Welford testified that after leaving the Latvian Club, he drove the car, and Morris, Freeman, and Swift were the initial passengers. (*Id.*, PageID.1115.) Subsequently, they met up with Petitioner, and Petitioner and Freeman switched places. (*Id.*, PageID.1116.) As Welford was driving, they saw the car that Davis was in. (*Id.*) Davis's car pulled up next to Welford's, and Welford testified that was when Petitioner "fired into the vehicle." (*Id.*, PageID.1117.) Welford testified that more than one shot was fired. (*Id.*) Welford was served with an investigative subpoena in January of 2018, while he was on work release. (*Id.*, PageID.1122.) He indicated that while at work release, he spoke about the subpoena with Petitioner's cousin, Roderick Smith, who was also at work release. (*Id.*, PageID.1123–1124.) Welford asked Smith to contact Petitioner and "let him know what was going on." (*Id.*, PageID.1124.)

When Welford was questioned pursuant to the subpoena, he testified that Petitioner had been the one who shot Davis. (*Id.*, PageID.1124–1125.) Four days afterward, Welford talked to Petitioner on the phone, and Petitioner asked what was going on and stated that he was about to "pull down" on Swift and Morris. (*Id.*, PageID.1126.) Welford testified that "pull down on somebody" means "going to see them." (*Id.*, PageID.1128.) On cross-examination, however, Welford admitted that for about half of the investigative subpoena interview, he did not "provide any information such as what [he] provided . . . in trial testimony to the prosecution," stating that he "kind of steered away from the truth until [he] got [his] attorney." (*Id.*, PageID.1142.)

Tyrice Morris provided testimony that was substantially in line with the testimony provided by Welford. He was in the car the night that Davis was shot and saw the car that Davis was in pull up next to the car Welford was driving. (*Id.*, PageID.1207.) Morris testified that he saw a gun in Petitioner's hand after the shots were fired. (*Id.*) Morris admitted that when police initially spoke to him in 2013, he did not admit that he was in the car when the shooting happened. (*Id.*, PageID.1212.) Morris indicated that he did not testify under oath about the shooting until 2018, when he received the subpoena. (*Id.*, PageID.1214.) He told Petitioner that he had testified pursuant to the subpoena, and that he was asked about the Davis murder. (*Id.*, PageID.1214–1215.) Morris was not contacted by the police again until after Swift's body was found. (*Id.*, PageID.1216.) At that time, he told law enforcement officials "what really happened" the night Davis was killed. (*Id.*, PageID.1218.) Morris admitted that he had "lied in the investigative subpoena." (*Id.*, PageID.1218–1219.) He also admitted that he was being held in jail on a material witness warrant to ensure his appearance at Petitioner's trial. (*Id.*, PageID.1222.)

Kenneth Welford, Eduardo Welford's father, testified that on the night Davis was killed, his son told him that he had been driving the car and that Petitioner had started shooting when they pulled up at a stop light. (Trial Tr. IV, ECF No. 8-10, PageID.1338.) Kenneth Welford's testimony was admitted to rebut the defense's theory that Eduardo Welford had testified pursuant to an "improper influence or motive." (*Id.*, PageID.1337.)

Grand Rapids Police Department Detective Amy Lowrie testified that after the investigation into Davis's murder was reopened in 2018, she and other officers were attempting to locate Swift to serve him with an investigative subpoena. (*Id.*, PageID.1350.) Two days after Javon Turley testified via subpoena, Lowrie was advised that officers had located Swift's body. (*Id.*, PageID.1353.) After learning that Swift was dead, she and other detectives started contacting other

17

witnesses, such as Turley, Freeman, and Morris, to "make sure that they were safe and accounted for." (*Id.*, PageID.1354.)

Jaimaelah Stokes, the mother of one of Swift's children, also testified at trial. (*Id.*, PageID.1406–1407.) She testified that she last saw Swift alive on January 17, 2018. (*Id.*, PageID.1407.) Stokes indicated that on that day, Swift told her that he wanted to meet with Petitioner to talk about something that had happened in 2013. (*Id.*, PageID.1412.) Stokes testified that Swift told her that he did not want to testify, and that he had been in the car and Petitioner had been the shooter. (*Id.*, PageID.1413.) Stokes noted that Swift was "pretty shaken up about it," and that he "wanted to either talk to [Petitioner] and tell him to admit what he [did] so he didn't have to testify, or he said that he was just gonna leave the state." (*Id.*) Stokes did not hear from Swift again after that day.

Grand Rapids Police Department Detective Matthew Kubiak is one law enforcement official who testified regarding the contents of the text messages that were retrieved from Petitioner's phone. When asked if he had heard the name Nanchelly Garcia, Detective Kubiak testified that Garcia's name came in "from information that we were—that we were able to get from the defendant's cell phone as someone he had a lot of contact with." (Trial Tr. V, ECF No. 8-11, PageID.1631–1632.) That information indicated that Garcia had rented vehicles for Petitioner, and that on January 16, 2018, she had turned in a Chevrolet Impala in Detroit in exchange for a gray Toyota minivan. (*Id.*, PageID.1632.) Detective Kubiak confirmed that information came from the "actual copy of the contents of [Petitioner's] cell phone." (*Id.*) Detective Kubiak also testified that Petitioner's text messages showed that "on the 17th [of January, 2018, Petitioner] had some communications with Glen and Tammy Johnson and had planned to deliver drugs to them." (*Id.*, PageID.1633–1634.)

Carlasia Wells, Swift's girlfriend at the time of his death, testified that she last saw Swift alive on January 10, 2018. (*Id.*, PageID.1649–1650.) She said that around that time, she could tell that something was "wrong" with Swift. (*Id.*, PageID.1651.) Wells testified that on January 10, 2018, she and Swift were coming back from Detroit, and she heard him on the phone arguing with someone. (*Id.*, PageID.1658.) Wells heard Swift say "[q]uit calling me." (*Id.*) She also heard Swift say "leave me alone" and "we don't have nothing to do with that situation. I don't want nothing to do with that." (*Id.*, PageID.1659.) After Swift hung up, he told Wells that he was talking to "Cam." (*Id.*, PageID.1661.)

Grand Rapids Police Department Detective Timothy DeVries testified as an expert "in the area of cell phone technologies and cell phone data extraction." (*Id.*, PageID.1684.) He was given numerous phones, including Petitioner's phones, to analyze in the course of the investigation. (*Id.*, PageID.1686.) DeVries copied the contents of both phones that belonged to Petitioner. (*Id.*, PageID.1686–1687.) DeVries testified that the text messages obtained from Petitioner's phone included "communication between [Petitioner] and Derek [Banks]," and that such communication took place "around the time that the homicide occurred." (*Id.*, PageID.1688–1689.) According to DeVries, these messages included discussion "about a gun." (*Id.*, PageID.1691.)

DeVries testified further that law enforcement "requested records on numerous phone numbers from cell phone providers." (*Id.*) The information that cell phone carriers provided included "a complete list of all incoming and outgoing communications from a particular individual's phone." (*Id.*) DeVries noted that the information provided by carriers could differ "from what's on the download of some of these phones, for instances the content's of somebody's phone." (*Id.*) He explained that the records provided by cell phone carries would "indicate an incoming call, an outgoing call, the inbound and outbound as well as the start and end times." (*Id.*,

PageID.1693.) The records would also "indicate whether there's a text message or whether it's a text message or voice call." (*Id.*) DeVries explained that law enforcement requests records from cell phone carriers even in situations where they've copied contents from cell phones because they "can get tower information from records, which means what tower they connected to when they used their phone to call." (*Id.*) Moreover, records from the carrier "can be much more complete" because individuals can delete contacts as well as messages. (*Id.*) The records obtained from cell phone carriers included Petitioner's cell phone records, which included cell tower locations when messages and calls were made to and from Petitioner's phone. (*Id.*, PageID.1692–1693.) DeVries was also given a phone obtained from Derek Banks to analyze. (*Id.*, PageID.1693.)

Grand Rapids Police Department Detective Patrick Needham testified that during the course of the investigation, law enforcement obtained cell phone records for about 18 different phones. (*Id.*, PageID.1706.) Needham testified that the cell phone records for a phone obtained from Petitioner indicated that he had numerous communications with Morris, Turley, Swift, and Welford between December 1, 2017, when Petitioner returned to the area, and January 19, 2018, when he was taken into custody. (*Id.*, PageID.1711–1712.) Needham indicated that the records indicated that Petitioner had deleted information from that time from his phone. (*Id.*, PageID.1713–1714.) When asked what appeared on the phone "during this time period where there appears to be deleted text messages," Needham testified that there were communications regarding "drug transactions. [Petitioner] dealing drugs with other people, selling drugs, talking about it. Those were not deleted." (*Id.*, PageID.1714.) Needham noted that if the contents of certain

communications could not be found on Petitioner's phone, the only other place they would be able to be found would be the victim's phone.[3] (*Id.*, PageID.1715.)

Needham testified that the records obtained from the cell phone carriers showed that Petitioner called Tyrice Morris three times before Morris testified pursuant to the investigative subpoena, and one time after he testified. (*Id.*, PageID.1716.) Furthermore, the text messages recovered from the dump of Petitioner's phone showed that on January 12, 2018, the date on which Welford testified via investigative subpoena, Nanchelly Garcia texted Petitioner about Welford and told Petitioner to "call [her] on the other phone." (*Id.*, PageID.1717.) Text messages also showed that Petitioner "referred to Derek Banks as the only person he's hanging around with." (*Id.*, PageID.1718.) Needham testified that after looking at the text messages recovered from the dump of Petitioner's phone, it was clear that Petitioner became "aware of a problem" with Welford prior to or shortly after January 12, 2018. (*Id.*, PageID.1719.)

Needham testified further that from 9:41 p.m. until 10:24 p.m. on January 17, 2018, Petitioner did not respond to anything that came in on his phone. (*Id.*, PageID.1725.) Needham also noted that the text messages retrieved from Petitioner's phone included texts between

---

[3] "The government may lawfully acquire many different types of data from electronic devices like cell phones, from as little as a phone's subscriber information to as much as the contents of conversations between two people." *United States v. Myles*, No. 5:15-cr-172-F-2, 2016 WL 16950765, at *5 (E.D.N.C. Apr. 26, 2016). Access to such communications is governed by the Stored Communications Act (SCA), 18 U.S.C. §§ 2701–2712. The SCA governs three types of information: (1) contents of wire or electronic communications that have been electronically stored; (2) contents of wire or electronic communications that are contained in a remote computing service; and (3) subscriber records concerning electronic communication or remote computing service. *See* 18 U.S.C. § 2703(a)–(c). Obtaining the first two categories of information requires either a search warrant or notice to the subscriber; the third may be obtained via court order. *Id.* § 2703(d). Detective Needham's testimony suggests that the contents of the text messages obtained from Petitioner's phone were not included with the records obtained from the cell phone service providers. However, in light of the foregoing, it is possible that the content of the text messages had been stored by the cell phone provider and could have been obtained via search warrant.

Petitioner and Tammy Johnson on the night of the 17th. (*Id.*, PageID.1725–1726.) Johnson asked Petitioner to bring some drugs to her and Glen Johnson. (*Id.*, PageID.1726.) At 9:10 p.m., Petitioner texted that he would be there in 30 minutes. (*Id.*) However, at 10:20 p.m., Tammy Johnson texted to ask if Petitioner was still coming. (*Id.*) Petitioner did not deliver the drugs until about 11:19 p.m., when he texted "come out." (*Id.*)

Needham testified that, according to the records obtained from cell phone carriers, the last outbound text message sent from Swift's phone was sent to Petitioner on January 17, 2018, at around 8:29 p.m. (*Id.*, PageID.1727.) After that time, there was no outbound activity on either of Swift's phones. (*Id.*) The last phone call Swift answered was from Petitioner at 9:06 p.m. (*Id.*) Needham testified that between January 16–17, 2018, there were 48 contacts between Petitioner's and Swift's phones. (*Id.*, PageID.1729.) On the 18th or 19th of January 2018, there was no contact between their phones. (*Id.*, PageID.1730.) Petitioner obtained a new cell phone on January 18, 2018, but did not add Swift as a contact at that time. (*Id.*, PageID.1730–1731.) On cross-examination, however, Needham did admit that Swift was not the only contact left out of Petitioner's new phone. (*Id.*, PageID.1748.)

Bao Nguyen testified that he went to Swift's apartment on the evening of January 17, 2018, at around 8:30 p.m. (Trial Tr. VI, ECF No. 8-12, PageID.1772.) He noted that when he arrived at Swift's apartment, Swift "was a little nervous, like looking out the window." (*Id.*) Nguyen admitted that he went to Swift's apartment to buy pain pills. (*Id.*, PageID.1774.) Nguyen testified that when he left Swift's apartment, he lost a pack of cigarettes and started looking for them using a flashlight. (*Id.*, PageID.1775.) While he was searching for them, he saw Petitioner coming towards the door to Swift's apartment. (*Id.*) Nguyen indicated that he had seen Petitioner about two times prior to that night and knew him through mutual acquaintances. (*Id.*, PageID.1779–

1780.) Nguyen texted Swift to ask if he was okay because he "felt something was wrong." (*Id.*, PageID.1781.) He texted and called Swift the next day, and never got a response. (*Id.*, PageID.1782.)

Nguyen testified that after he learned that Swift had been found dead, he wanted to call the Silent Observer hotline. (*Id.*, PageID.1785.) However, on January 20, 2018, he ended up calling the Grand Rapids Police Department. (*Id.*) Nguyen was interviewed by Detectives Needham and Kubiak on January 23, 2018, and at that time he told them that he had seen Petitioner near Swift's apartment. (*Id.*, PageID.1786–1787.)

Glen Johnson testified that he and his wife Tammy would buy crack cocaine from Petitioner. (*Id.*, PageID.1845–1846.) They communicated with Petitioner via text message on the evening of January 17, 2018, seeking to buy drugs. (*Id.*, PageID.1847.) Petitioner responded "yes" at 9:07 p.m. (*Id.*, PageID.1848.) Around 9:10 p.m., Petitioner texted that he would meet them in about 30 minutes. (*Id.*) Johnson testified, however, that Petitioner did not get there in 30 minutes. (*Id.*) Petitioner did not respond that he was coming until 10:41 p.m. (*Id.*, PageID.1849.) However, Tammy did not get a text to come outside and meet Petitioner until 11:19 p.m. (*Id.*)

FBI Special Agent Joseph Raschke testified as an expert in cell phone technology. (Trial Tr. VII, ECF No. 8-13, PageID.2038.) Raschke testified that he was contacted and asked to assist in mapping several phone numbers during the investigation into Swift's death. (*Id.*, PageID.2039.) Raschke admitted that records cannot pinpoint a phone's location to a specific address; instead, records can only indicate a "general area." (*Id.*, PageID.2047.) According to the records, Petitioner and Derek Banks were utilizing their cell phones "in similar time periods and in similar tower location sectors" on January 16, 2018. (*Id.*, PageID.2047–2048.) The phones were also in the same area on January 17, 2018. (*Id.*, PageID.2050–2051.) Raschke testified further that Petitioner's cell

phone pinged off towers near Swift's residence at approximately 9:40 p.m. on January 17, 2018. (*Id.*, PageID.2061.)

After Raschke testified, the prosecution recalled Detective Needham for further testimony. Needham testified that Petitioner was "picked up out on Prospect" regarding the Andre Davis murder on January 19, 2018, after Swift's body was found. (*Id.*, PageID.2091.) Needham testified that police were drawn to that area because they had a cell phone number for Petitioner and had a "ping on his phone." (*Id.*, PageID.2092.) During the search of the residence, law enforcement recovered two phones. (*Id.*, PageID.2094.) Law enforcement took those to the police department, called the number they had for Petitioner, and one of the phones rang. (*Id.*, PageID.2095.) Needham testified further that during the investigation, law enforcement officials checked Nanchelly Garcia's phone, and that the check indicated that there "were several deletions of contact between her" and Petitioner. (*Id.*, PageID.2102–2103.)

Upon consideration of the testimony and evidence summarized above, it is apparent that, contrary to Petitioner's assertion, the contents of the text messages obtained from Petitioner's cell phone were not the "linchpin" of the prosecution's case against Petitioner. Instead, numerous individuals testified that the Grand Rapids Police Department had reopened the investigation into Andre Davis's death, and that several individuals, including Welford and Morris, had been subpoenaed to provide information about that night. Petitioner was aware that those individuals had been subpoenaed. Petitioner was also aware of the likelihood that law enforcement would want to talk to Swift about Davis's murder. Petitioner told people that he wanted to talk to Swift. Moreover, Swift had indicated that he wanted Petitioner to confess to the 2013 shooting. Moreover, the cell phone records that law enforcement legally obtained showed that Petitioner was in contact with Swift numerous times shortly before his death, that Petitioner's phone was in the area near

24

Swift's residence the night he was killed, and that both Petitioner's and Banks's phones were in the same location in the period shortly before Swift was killed. Moreover, Petitioner was seen outside Swift's residence near that same time, and Swift had no contact with anyone after the time Petitioner was seen outside of Swift's residence.

Although Petitioner suggests that the testimony provided by Morris and Welford was "weakened" because they testified in exchange for immunity and, therefore, should not have been deemed credible witnesses (ECF No. 11, PageID.2773), it is up the jury to decide issues of credibility and draw rational inferences. *See Herrera v. Collins*, 506 U.S. 390, 401–02 (1993); *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). Petitioner speculates further that the text message evidence was harmful to his verdict because the prosecution placed emphasis on the "conspiracy texts" during closing arguments. A review of closing arguments indicates that while the prosecution did refer to the text messages and the fact that cell phone records indicated that messages had been deleted from Petitioner's phone, the prosecution did not emphasize that evidence over all other evidence presented. Moreover, the trial judge instructed the jury that closing arguments were not evidence (Trial. Tr. VIII, ECF No. 8-14, PageID.2286), and jurors are presumed to follow their instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Moreover, to the extent Petitioner takes issue with the admission of text messages between him and Glen and Tammy Johnson regarding a drug transaction, such evidence was cumulative to Glen Johnson's own testimony regarding his communications with Petitioner on the evening of January 17, 2018.

Even without the text messages obtained from Petitioner's phone, the prosecution presented overwhelming circumstantial evidence from which the jury could rationally infer that Petitioner was guilty of first-degree murder, whether he shot Swift himself or orchestrated Swift's killing by Banks.

25

This Court does not have "grave doubt" about the effect of the Fifth Amendment error on the outcome of Petitioner's trial, *Davis*, 576 U.S. at 268, as Petitioner simply has not demonstrated that actual prejudice resulted from the admission of the text message evidence. *See Brecht*, 507 U.S. at 637 (quoting *Lane*, 474 U.S. at 449). Instead, Petitioner's arguments amount to nothing but "mere speculation" that he was prejudiced. *See Calderon*, 525 U.S. at 146. Accordingly, because Petitioner has not demonstrated that the Fifth Amendment error had a "substantial and injurious effect or influence" on the outcome of his trial, *id.*, he is not entitled to federal habeas relief.[4]

## V.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined Petitioner's claim under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that

---

[4] The *Brown* opinion makes clear that the *Brecht* test and the AEDPA test are distinct and independent. *Brown*, 596 U.S. at 135 (stating that the standards "pose courts with different questions to resolve and require courts to answer those questions based on different legal materials.") Nonetheless, in this instance, the Court's determination that any error was harmless under *Brecht* also effectively means that relief is barred under the AEDPA. Even considering possible differences in the meaning of the term "prejudice" under the two standards, this Court would not conclude that "*every* fairminded jurist would agree that an error was prejudicial," *id.*, where the Court has already concluded that any error was not prejudicial. Accordingly, Petitioner's claim would fail under the AEDPA test as well.

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claim was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

The Court will enter a judgment denying the petition, as well as an order denying a certificate of appealability and Petitioner's motion for writ of mandamus and prohibition and other extraordinary writs (ECF No. 15).

Dated:    November 8, 2023                      /s/ Paul L. Maloney
                                                Paul L. Maloney
                                                United States District Judge